UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CHAMBERS OF
RONALD J. HEDGES
UNITED STATES MAGISTRATE JUDGE

MARTIN LUTHER KING, JR.
FEDERAL BUILDING AND COURTHOUSE
50 WALNUT STREET
NEWARK, NJ 07101
973-645-3827

October 16, 2006

**LETTER-OPINION AND ORDER**
**ORIGINAL FILED WITH CLERK OF THE COURT**

**JEFFREY A. COHEN**
**JOHN F. OLSEN**
**ATTORNEYS FOR PLAINTIFF JON M. ROGERS, M.D.**
ROBERTSON, FREILICH, BRUNO & COHEN, LLC
ONE RIVERFRONT PLAZA
NEWARK, NJ 07102
(973) 848-2100

**SEAN X. KELLY**
**ATTORNEY FOR DEFENDANTS KATSURA KASAHARA**
**& ONO PHARMA USA, INC.**
MARKS, O'NEILL, O'BRIEN & COURTNEY, PC
COOPER RIVER WEST
6981 N. PARK DRIVE
SUITE 300
PENNSAUKEN, NJ 08109
(856) 663-4300

**ERIC B. SIGDA**
**CLARK P. RUSSELL**
**ATTORNEYS FOR DEFENDANTS ONO PHARMACEUTICAL**
**CO., LTD. & SHOZO MATSUOKA**
GREENBERG TRAURIG, LLP
200 PARK AVE.
P.O. BOX 677
FLORHAM PARK, NJ 07932
(973) 360-7900

  **Re: Jon M. Rogers, M.D. v. Katsura Kasahara, et al.**
  **Civil Action No.: 06-2033 (PGS)**

## INTRODUCTION

This matter comes before me on the motion of defendants Ono Pharmaceutical Co., Ltd. and Shozo Matsuoka to dismiss Plaintiff Rogers' Complaint on grounds of insufficient service of process and lack of personal jurisdiction.  Alternatively, the defendants move to stay judicial proceedings and compel arbitration. Rogers opposes the motion.  The motion was referred to me by Judge Sheridan.  I have considered the papers submitted in support of and in opposition to the motion.  There was no oral argument.  Rule 78.

## BACKGROUND

Defendant Shozo Matsuoka ("Matsuoka") is Executive Director of Development Headquarters, of Ono Pharmaceutical Co., Ltd. and a resident of Japan.  Defendant Ono Pharmaceutical Co., Ltd. ("Ono Japan")[1] is incorporated in Japan with its principal place of business in Japan.  Defendant Ono Pharma USA, Inc. ("OPUS") is a subsidiary of Ono Japan, incorporated in Delaware, with its principal place of business in New Jersey.[2]  Defendant Katsura Kasahara ("Kasakara") is OPUS' President and a resident of New Jersey.  Plaintiff Jon M. Rogers, M.D., ("Rogers") is also a resident of New Jersey.

OPUS hired Rogers as Director of Drug Development in August 1999.  He was promoted to Vice President of Drug Development in 2000, then to Senior Vice President of Drug Development in April 2005.  Rogers claims he was the lead OPUS executive in charge of establishing and leading OPUS' Drug Development operation in the United States and Canada.

---

[1] Defendants Matsuoka and Ono Japan are the moving parties in this motion decided herein, referred to collectively as "Japanese defendants" or "defendants."

[2] Ono Japan and OPUS will be referred to collectively as "Ono."

He also claims that he was legally responsible for monitoring the conduct and progress of all clinical investigations and ensuring compliance of OPUS' human research activities with all applicable laws, regulations, and guidelines. He reported directly to Kasahara until October 2005. He then reported to Matsuoka until his termination on December 12, 2005.

Rogers claims he was terminated because he engaged in protected activity as defined by the New Jersey Conscientious Employee Protection Act ("CEPA"), as codified at N.J.S.A. § 34:19-1 et seq. His Complaint details lengthy safety concerns regarding certain drug trials he claims he was responsible for monitoring. At the crux of Rogers' CEPA claim is his assertion that he was terminated for denying approval of increased dosages in drug trials, recommending additional drug studies, and requesting that additional warnings be issued to participants in the trials. He claims that defendants rejected his advice repeatedly, and at his refusal to move forward with OPUS' suggestions, they retaliated by terminating his employment. He responded by filing this action. He served process on the Japanese defendants by transmitting summonses and the Complaint via DHL. The Japanese defendants move to have Rogers' action dismissed for insufficient service of process and lack of personal jurisdiciton.

Rogers signed an employment agreement with OPUS that contained an arbitration provision. The Japanese defendants alternatively request that I stay judicial proceedings and compel arbitration as a result of this provision. Rogers disagrees and opposes this motion.

For the reasons below, I disagree with the defendants and conclude: (1) service of process was proper, (2) this Court has personal jurisdiction over the Japanese defendants, and (3) arbitration is not proper here.

## DISCUSSION

## SERVICE OF PROCESS

Rule 4(f) governs service of process upon an individual in a foreign country.

> Unless otherwise provided by federal law, service upon an individual . . . may be effected in a place not within any judicial district of the United States: (1) by any internationally agreed means reasonably calculated to give notice, such as those means authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents.

Rule 4(h) governs service of process upon a corporation:

> Unless otherwise provided by federal law, service upon a domestic or foreign corporation or upon a partnership or other unincorporated association that is subject to suit under a common name, and from which a waiver of service has not been obtained and filed, shall be effected: (2) in a place not within any judicial district of the United States in any manner prescribed for individuals by subdivision (f) except personal delivery as provided in paragraph (2)(C)(i) thereof.

The Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters applies to any action "where there is occasion to transmit a judicial or extrajudicial document for service abroad." Nov. 15, 1965, 20 U.S.T. 361, at 362, Art. 1 (hereinafter "Convention" or "Hague Convention"). All actions to which the Convention applies are required to comply with its terms. Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. 694, 699 (1988). Both Japan and the United States are signatories to the Convention. Therefore, Rogers was required to serve process on the Japanese defendants in accordance with the Convention.

The Hague Convention was created with the goal of "[providing] a simpler way to serve process abroad, to assure that defendants sued in foreign jurisdictions would receive actual and timely notice of suit, and to facilitate proof of service abroad." Volkswagenwerk, 486 U.S. at 698. The Hague Convention provides plaintiffs with a variety of methods to serve process on a

defendant that resides in a country that has signed the treaty.  Article 10 of the Convention is relevant here:

> Provided the State of destination does not object, the present Convention shall not interfere with (a) the freedom to send judicial documents, by postal channels, directly to persons abroad,
> (b) the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination,
> (c) the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination.

Article 10(a) has been the subject of much debate because of its use of the word "send" in contrast to its use of the phrase "to effect service" in Articles 10(b) and 10(c).  The United States has not objected to any of the provisions in Article 10, but Japan has objected to Article 10(b) and (c).  Japan has not specifically objected to Article 10(a), but instead clarified its position in a Special Commission on the O5peration of the Conventions on the Service of Documents Abroad and on the Taking of Evidence Abroad held in 1989:  "Japan has made it clear that no objection to the use of postal channels for sending judicial documents to persons in Japan does not necessarily imply that the sending by such a method is considered valid service in Japan; it merely indicates that Japan does not consider it as infringement of its sovereign power." <u>Gapanovich v. Kamori Corporation</u>, 255 N.J. Super. 607, 615 (App. Div. 1992).  While Japan has not expressly approved the use of postal channels as effective service of process, it has not technically objected to Article 10(a).  In order for an objection to any of the Hague Convention's provisions to be valid, a country must register its formal objection pursuant to Article 21.  Failure to do so is tacit agreement to all provisions ratified without an accompanying formal objection.

See Article 21 of the Convention.    Japan registered objections for Articles 10(b) and (c), but registered no objections to Article 10(a).

The Eighth Circuit used a strict constructionist view in deciding that Article 10(a) permitted only the sending of post-service judicial documents and not service of process.  See generally Bankston v. Toyota Motor Corp., 889 F.2d 173-74 (8th Cir. 1989).  In doing so, Bankston reasoned the words "service of process" and "service" were deliberately used by the drafters throughout the treaty to represent service of papers between parties in the initial stages of a judicial proceeding.  The lack of these words in Article 10(a) was deemed intentional; consequently, Article 10(a) could not authorize service of process.  889 F.2d at 172.

The Second Circuit represents the other side of a lengthy debate on this issue.  See generally Ackermann v. Levine, 788 F.2d 830 (Cir. 2d 1986).  There, the court held service of process by registered mail is valid in a country that has not opposed Article 10(a), noting that due process permits service of process by registered mail so long as it provides sufficient notice to the litigants of the pending action.  788 F.2d at 840-41.

A clear split exists among the district courts of the Third Circuit.  See, e.g., Raffa v. Nissan Motor Co., 141 F.R.D. 45 (E.D. Pa. 1991); Eli Lilly & Co. v. Roussel Corp., 23 F. Supp. 2d 460 (D.N.J. 1998).  Raffa agreed with Bankston and further addressed the fact that Japan's own internal law did not permit service of process through mail.  Raffa, 141 F.R.D. at 46.  The court declared it "illogical to think that Japan . . . would allow service through the mail by foreign corporations." 141 F.R.D. at 46; see Gallagher v. Mazda Motor of America, Inc., 781 F. Supp. 1079, 1082 (E.D. Pa. 1992).

The District of New Jersey has specifically rejected this reasoning in holding that Article 10(a) authorizes service of process by registered mail. Eli Lilly, 23 F. Supp. 2d at 473. Approving of a decision from New Jersey's state courts, Eli Lilly stated "the meaning of Article 10(a) must be the same with respect to all the signatory nations. Their internal laws as to mail service may be, and undoubtedly are, diverse. The meaning of this international treaty must be uniform." 23 F. Supp. 2d at 473 (quoting Gapanovich v. Kamori Corp., 255 N.J. Super. 607, 615 (App. Div. 1992).

Furthermore, "the 'plain meaning' of Article 10(a) actually permits service of process." EOI Corp. v. Medical Marketing, 172 F.R.D. 133, 141 (D.N.J. 1997). "[T]he word 'send' as defined by Webster's Dictionary means 'to cause to go; . . . to dispatch by a means of communication; . . . to cause to be carried to a destination . . .'" 172 F.R.D. at 137 (quoting Webster's Ninth New Collegiate Dictionary (1985)). Further analysis of the words "judicial" and "documents" demonstrate that Article 10(a), by its plain meaning, permits service of process when a plaintiff exercises the "freedom to send judicial documents, by postal channels, directly to persons abroad." 172 F.R.D. at 37.

Courts that conclude Article 10(a) does not permit service of process point out that service of process is often a technical term, one that qualifies in the legal world as a term of art with a "'well-established technical meaning'." Charas v. Sand Tech. Sys. Int'l, 1992 U.S. Dist. LEXIS 15227 at *8 (S.D.N.Y. October 7, 1992) (quoting Volkswagonwerk, 486 U.S. at 700). The phrase "methods of transmission" is used in Article 21 as a synonym for service of process, supporting the interpretation of "send" in Article 10(a) as equivalent to "service of process" in

that section.  EOI, 172 F.R.D. at 138-39.  Indeed, Article 10(a) would be misplaced in Article 10 and the Convention as a whole if it did not refer to service.  172 F.R.D. at 137.

Moreover, if Article 10(a) were not intended to effect service, the plain meaning would leave no other interpretation but to bar the sending of judicial documents to countries that objected to it once service had been effected.  This would make continuing litigation with foreigners onerous, if not impossible.  Once service of process had been effected, postal channels would be closed to the parties as a further means of communication.  This interpretation is simply not plausible.  172 F.R.D. at 141.  Viewing Article 10(a) in this light, the provision could not have meant anything less than permitting service of process.

Finally, while "not dispositive, courts often give great weight to treaty interpretations made by the Executive Branch."  Eli Lilly, 23 F. Supp. 2d at 471 (quoting R. Griggs Group Ltd. v. Filanto S.P.A., 920 F. Supp. 1100, 1106 (D. Nev. 1996)).  The United States State Department reads Article 10(a) as permitting service by mail in stating its position that Bankston was incorrect in holding the Hague Convention did not permit service of process via registered mail.  Eli Lilly, 23 F. Supp. 2d at 471.  Furthermore, Bruno Ristau, a leading commentator on the Hague Convention and the United States Representative to the Special Commission, stated that, "unless a contracting state has by its declaration expressly prohibited it, service of foreign judicial documents may be effected within its territory by mail."  1 B. Ristau, International Judicial Assistance (Civil and Commercial) 4-3-5(2), 148-49 (1995) (emphasis added).  Japan did not expressly reject Article 10(a) and said as much in its clarification during the Second Special Commission.

For the reasons cited above, I conclude that service of process by registered mail on the Japanese defendants was proper.

## **PERSONAL JURISDICTION**

Personal jurisdiction may be exercised through either general or specific jurisdiction. General jurisdiction is granted over a defendant that establishes "continuous and systematic" contacts with the forum state. International Shoe Co. v. Washington, 326 U.S. 310, 318 (1945). This holds true regardless of whether these contacts are related to the instant complaint. Vetrotex Certain Teed Corp. v. Consol. Fiber Glass Prod. Co., 75 F.3d 147, 150-51 (3d Cir. 1996). General jurisdiction requires the plaintiff to meet a much higher threshold in proving the defendant's contacts are more than minimum. To satisfy the Due Process Clause of the Fourteenth Amendment, however, both general and specific jurisdiction require "the defendant's conduct and connection with the forum State [to be] such that he should reasonably anticipate being haled into court there." Worldwide Volkswagen Corp. V. Woodson, 444 U.S. 286, 287 (1980).

A court has specific jurisdiction over a defendant when the claim "[arises] out of or [relates] to the defendant's contacts with the forum." Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 411 (1984). "Jurisdiction is proper . . . where the contacts proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State." Asahi Metal Industry Co. v. Superior Court of California, 480 U.S. 102, at 109 (1987) (quoting McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223 (1957))(emphasis in original). The minimum contacts must be based on the acts of the defendant. Asahi, 480 U.S. at 109. So long as it creates a "substantial connection" with the forum, even a single act can support jurisdiction. McGee,

9

355 U.S. at 223. Furthermore, physical entrance into the forum state is not necessary to satisfy presence. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985). A wide variety of methods are readily used to conduct business so that corporate matters can be resolved without stepping foot inside a forum state's boundaries. 471 U.S. at 476.

I am obligated to "accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff." Pinker V. Roche Holdings, 292 F.3d 361, 371 (3d Cir. 2002) (quoting Carteret Sav. Bank v. Shushan, 954 F.2d 141, 142 n.1 (3d Cir. 1992). Rogers has alleged a significant number of contacts with both Japanese defendants in his complaint, some of which defendants dispute. Specific to this action, Rogers claims the Japanese defendants made or approved the decision to terminate him and controlled his employment while at OPUS. Rogers alleges and Matsuoka concedes that he was consulted on hiring Rogers as Director of Drug Development in 1999, though Matsuoka claims the final decision rested with OPUS. Rogers further alleges that he reported directly to Matsuoka in Japan from October 2005 until he was terminated in December 2005. That defendant Matsuoka disputes this allegation is of no consequence. Disputes must be resolved in favor of the complainant as if they were true. Pinker, 292 F.3d at 371. If Rogers' allegations are true, Matsuoka's and Ono Japan's involvement with Rogers during his employment with OPUS are more than enough to satisfy specific jurisdiction to both of the Japanese defendants as the claim arises out of their contacts with the state of New Jersey regarding this claim. See Helicopteros, 466 U.S. at 411. Personal jurisdiction over the Japanese defendants in the instant action is proper.

## **ARBITRATION**

Defendants have alternatively moved to stay judicial proceedings and compel arbitration. The arbitration clause reads in relevant part:

> With the exception of an action for equitable relief arising from a breach of the Proprietary Rights and Confidentiality Agreement, any controversy between Employee and Ono or between Employee and any employee of Ono arising out of or related to his employment with Ono, including, but not limited to claims of race, age, gender, religious, or national origin discrimination under federal, state or local laws and those involving the construction or application of any of the terms, provisions or conditions of this Agreement, shall be settled by arbitration in accordance with the then current employment dispute resolution rules of the American Arbitration Association, and judgement [sic] on the award rendered by the arbitrator(s) may be rendered by any court having jurisdiction thereof.  Parties shall be [sic] their own legal fees associated with the arbitration.  The location of the arbitration shall be in Hackensack, New Jersey.

Rogers argues the clause is defective in two respects: (1) that the language does not include statutory claims such as Rogers' CEPA claim, and (2) the clause lacks language referring to termination, precluding its application to Rogers' CEPA claim, which arises out of his termination.  I conclude that this arbitration clause is inapplicable to the instant action because it fails to include matters arising out of Rogers' employment termination.

Under the Federal Arbitration Act ("FAA"), ambiguities in contracts are to be resolved in favor of arbitration.  Yale Materials Handling Corp. v. White Storage & Retrieval Systems, Inc., 240 N.J. Super. 370, 376 (App. Div. 1990).  Rogers' claims, however, do not involve an employment contract regarding maritime transactions or transactions related to interstate or foreign commerce.  Labib v. Younan, 755 F. Supp. 125, 127 (D.N.J. 1991); 9 U.S.C. § 1 et seq (2006).  Therefore, the FAA does not control, and I must apply traditional state-law principles

governing contract formation to determine whether the parties agreed to arbitrate this dispute. 755 F. Supp. at 127; See Martindale v. Sandvik, 173 N.J. 76, 85 (2002).

  New Jersey liberally construes contracts in favor of arbitrating statutory grievances when the agreement waives statutory remedies "clearly and unmistakably . . . and contractual language alleged to constitute a waiver will not be read expansively." Red Bank Reg'l Educ. Ass'n v. Red Bank Reg'l High Sch. Bd. Of Educ., 78 N.J. 122, 140 (1978). This standard was later clarified as "[t]o pass muster . . . a waiver-of-rights provision should at least provide that the employee agrees to arbitrate all statutory claims arising out of the employment relationship or its termination. It should also reflect the employee's general understanding of the type of claims included in the waiver." Garfinkel v. Morristown OBGYN Assoc., 168 N.J. 124, 135 (2001)(emphasis added). The disputed provision in Garfinkel compelled arbitration for "any controversy arising out of, or relating to, this Agreement or the breach thereof." 168 N.J. at 127. The court ruled that the plaintiff did not waive his statutory remedies, stating that language in an arbitration clause must clearly and unambiguously waive statutory claims in order to be effective. 168 N.J. at 136.

  A similar clause was discussed in a recent Appellate Division case. Quigley v. KPMG Peat Marwick, 330 N.J. Super. 252, 257 (App. Div. 2000). In Quigley, the relevant provision stated "[a]ny claim or controversy between the parties arising out of or relating to this Agreement or the breach thereof, or in any way related to the terms and conditions of employment . . ., shall be settled by arbitration." 330 N.J. Super. at 257. Quigley commented that "[n]otably, there is no mention in the clause of arbitrating disputes arising from 'plaintiff's termination.'" 330 N.J. Super. at 272. Garfinkel approved of this reasoning, also noting that the arbitration clause in

12

Quigley "did not refer specifically to disputes arising from termination." Garfinkel, 168 N.J. at 133.

The cases upon which the Japanese defendants rely only reinforce my decision that the arbitration provision cannot be upheld due to its lack of termination language. Young v. Prudential Ins. Co. of America involved an arbitration clause that indicated to that plaintiff "[a]ny dispute, claim or controversy . . . arising out of the employment or termination of employment . . . shall be arbitrated under this Code." 297 N.J. Super. 605, 614 (App. Div. 1997) (emphasis in original). The plaintiff was bound to arbitration regarding his statutory claim because the language was so clear. 297 N.J. Super. at 621.

The provision in Singer v. Commodities Corp. required the plaintiff to "arbitrate any dispute, claim or controversy . . . under the rules, constitutions, or by-laws of the organizations indicated in Item 10." 292 N.J. Super. 391, 405 (App. Div. 1996). One of the organizations under Item 10 required "arbitration of any dispute, claim or controversy arising out of or in connection with the business of any member of the Association, or arising out of the employment or termination of employment of associated person(s) with any member . . . ." 292 N.J. Super. at 406 (emphasis in original). The language was unmistakably clear, and the plaintiff was required to arbitrate the dispute. 292 N.J. Super. at 406.

Arbitration provisions are not restricted to the use of the word "termination" to satisfy the termination language requirement. In Labib, the relevant provision read "[a]ny controversies or disagreements arising out of, or relating to this Agreement or breach thereof, shall be settled by arbitration." 755 F. Supp. at 129. The clause referred to the entire employment contract and

13

included the phrase "or breach thereof," analogous to the "termination" language missing in Rogers' arbitration clause. The plaintiff's arbitration provision in Labib was ultimately upheld because the necessary termination language was evident, clearly and unmistakably qualifying plaintiff's termination as arbitrable. 755 F. Supp. at 129.

The defendants cite a lone Law Division case decided under the Federal Arbitration Act that held the employment agreement's discussion of termination elsewhere in the contract satisfied the termination language requirement for the arbitration provision because the arbitration provision included the entire employment agreement. See Bleumer v. Parkway Ins. Co., 277 N.J. Super. 378, 402 (Law Div. 1994). The arbitration provision stated that "[a]ny disputes between you and FFIC regarding this agreement will be resolved by arbitration." 277 N.J. Super. at 402. The court held arbitration was proper because the plaintiff's termination was discussed elsewhere in the agreement. 277 N.J. Super. at 403-04.

The arbitration provision in Rogers' employment contract incorporates the entire employment agreement between OPUS and Rogers, which in turn discusses termination. The agreement does not, however, involve interstate, foreign, or maritime commerce issues that invoke the FAA's standards of resolving ambiguities in favor of arbitration used in Bleumer. See 277 N.J. Super. at 402. New Jersey law fully complies with federal law that liberally enforces arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Singer, 292 N.J. Super. at 405. The standard to compel arbitration for statutory remedies in New Jersey requires that the language must waive them "clearly and unmistakably." Red Bank 78 N.J. 122 at 140. Under

14

New Jersey law, the arbitration clause here does not meet that standard, even considering that termination is referenced elsewhere in the employment agreement.

The clause does not contain termination language or language regarding breach of the agreement.  The arbitration clause in Rogers' employment agreement does not clearly and unmistakably waive Rogers' CEPA claims.

## **CONCLUSION**

Based on the foregoing, the defendant's motion to dismiss and motion to stay judicial proceedings in favor of arbitration is DENIED.


SO ORDERED.


/s/ Ronald Hedges
United States Magistrate Judge

Original:    Clerk
cc:          All addresses
             Hon. Peter G. Sheridan, U.S.D.J.
             File

16